716 P.2d 1224 (1986)
110 Idaho 452
In the Matter of the ESTATE OF Barbara Louise Hurst KEEVEN, Deceased.
Sylvester H. KEEVEN, Plaintiff-Counterdefendant, Appellant,
v.
Lila WAKLEY, Personal Representative, Defendant-Counterclaimant, Respondent.
No. 15615.
Supreme Court of Idaho.
January 20, 1986.
Rehearing Denied April 17, 1986.
*1225 John B. Kugler, Pocatello, for plaintiff-counterdefendant, appellant.
DaLon Esplin, Pocatello, for defendant-counterclaimant, respondent.
DONALDSON, Chief Justice.
This is an appeal from an order of the magistrate court that (1) the appellant, Sylvester Keeven, was not an omitted spouse in his deceased wife's will within the meaning of I.C. § 15-2-301 and (2) the decedent's real property was her separate property. The district court dismissed Keeven's appeal stating that it was not provided for by statute and that the magistrate's order was not a final judgment. We reverse the district court's dismissal of Keeven's appeal and affirm the magistrate court's order.
The facts of the case are as follows. Barbara VanLeuven was a widow when she *1226 and Sylvester Keeven began living together around 1976. In March of 1979, Barbara executed a will, leaving her personal property in equal shares to her five children, and her real property in six equal shares to her five children and her "dear friend Sylvester Keeven." The residue of Barbara's estate was left in equal shares to her children. Barbara's sister, Lila Wakley, was nominated as personal representative.
In February of 1980, Barbara married Sylvester Keeven. On September 19, 1982, Barbara died. The will of March 1979 had not been redrafted, amended or revoked.
Lila Wakley made an informal application for probate of the will on October 13, 1982. She was appointed personal representative and gave notice to Keeven. Keeven petitioned for homestead, exempt property and family allowances provided under I.C. § 15-2-401. On December 13, 1982, the parties stipulated that Keeven was entitled to the allowances and that he was entitled to live in the house for a maximum of one year after the decedent's death.
An inventory listing was filed on March 17, 1983, and a second inventory was filed on May 5, 1983, characterizing and valuing the property of the decedent as separate or community.
On April 27, 1983, the personal representative moved for partial summary judgment approving the characterization of decedent's real property, a house in Lava Hot Springs, as her separate property. In response, Keeven filed an affidavit alleging that he personally performed a majority of the construction of the house and contributed his own money and resources to its construction. He also alleged that he and his deceased wife had always intended and agreed to consider the house as belonging to each of them. The personal representative's motion was granted. In its Memorandum Decision and Order, dated June 30, 1983, the magistrate court refused to consider Keeven's affidavit of the oral agreement between himself and the decedent since such testimony would violate I.C. § 9-202(3) (Idaho's Deadman Statute). The magistrate stated that since there existed no written agreement as to the transmutation of the separate real property to community property, there was no genuine issue of material fact to preclude declaring the real property as separate.
Both Keeven and the personal representative then filed motions for partial summary judgment to determine if Keeven was an omitted spouse pursuant to I.C. § 15-2-301 and therefore entitled to an intestate share of decedent's estate. After a hearing, the magistrate court granted the personal representative's motion. The court found that Keeven was provided for in the will.
The personal representative had also filed a motion for partial summary judgment to settle the characterization and valuation of all property in the second inventory based on Keeven's failure to respond to her Requests for Admissions. On February 6, 1984, the court denied this motion holding that the facts contained in the second inventory were still in dispute. The magistrate also ordered Keeven to turn over possession of the house to the personal representative.
Keeven filed an appeal of the magistrate court's order to the district court. The personal representative filed a motion to dismiss the appeal and, in the alternative, filed a cross-appeal on the magistrate's denial of partial summary judgment settling the characterization and valuation of the property in the second inventory. Initially, the district court dismissed Keeven's appeal but suggested it would again entertain the appeal if the magistrate court certified that its order constituted a final judgment under Rule 54(b).
On May 3, 1984, the magistrate court did certify its order, and the district court again took jurisdiction and scheduled briefing and hearing dates on the appeal.
After a hearing, the district court issued an order striking its previous order scheduling the case for appellate briefs and hearing. It also modified its previous decision by eliminating that portion suggesting it *1227 would entertain an appeal if a Rule 54(b) certificate was filed by the magistrate court. The district court remanded the case to the magistrate court for completion of the probate and stated it would not entertain any more appeals until the probate was completed, unless the appeal was specifically provided for by the rules or statutes.
Keeven now appeals that dismissal to this Court.

I

Appealability of the Magistrate's Order
Under I.A.R. 11(b), Keeven can appeal the magistrate's order to the Supreme Court in this probate proceeding as a matter of right only if the order would have been appealable from the magistrate to the district court. Whether the magistrate's order is appealable to the district court is governed by I.R.C.P. 83(a). In this case, I.R.C.P. 83(a)(3) provides the avenue for Keeven's appeal. That part of the rule provides for an appeal "[f]rom any order, judgment or decree by a magistrate in a special proceeding in which an appeal is provided by statute."
I.C. § 17-201 is the statute which governs appeals to the district court in probate matters. That section reads

"Appealable judgments and orders.
 An appeal may be taken to the district court of the county from a judgment, or order of the magistrate's division of the district court in probate matters:
"1. Granting, refusing or revoking, or refusing to revoke, letters testamentary, or of administration, or of guardianship.
"2. Admitting, or refusing to admit, a will to probate.
"3. Against or in favor of the validity of a will, or revoking or refusing to revoke the probate thereof.
"4. Against or in favor of setting apart property, or making an allowance for a widow or child.
"5. Against or in favor of directing the partition, lease, mortgage, sale or conveyance of real property.
"6. Settling an account of an executor, administrator or guardian.
"7. Refusing, allowing or directing the distribution or partition of an estate, or any part thereof, or the payment of a debt, claim, legacy or distributive share.
"8. Confirming report of appraiser setting apart the homestead."
Keeven argues that the questions raised in his appeal of the magistrate's order deal with issues encompassed in subsections 3, 4 and 7 of this statute. The district court disagreed, noting that "the only exception which vaguely matches any of the issues decided by the magistrate is exception No. 7, which speaks of the `distribution or partition of an estate, or any part thereof, or the payment of a debt, claim, legacy or distributive share.'" However, the court said, since the personal representative's "administration" of the estate does not constitute a "distribution" of the estate, subsection 7 is inapplicable.
We agree with the district court that subsection 7 is inapplicable, and based on the plain language of subsection 4, it too appears inapplicable. Only subsection 3 provides a colorable basis on which Keeven can appeal.
In Estate of Pierce, 95 Idaho 625, 515 P.2d 1017 (1973), this Court noted that
"By the enactment of I.C. § 17-201, the legislature intended that certain actions taken by the courts handling the settlement of decedent's estate were of such material consequence that it was essential the decisions reached by the courts in those areas should be subject to review by a higher court regardless of whether such decisions were `final judgments' as provided by I.C. § 13-201." Id. at 626, 515 P.2d at 1018.
In Pierce, the Court held that an order of intestacy and appointment of an administrator was appealable under I.C. § 17-201(1) even though not a final judgment. See also, Estate of Spencer, 106 Idaho 316, 318, 678 P.2d 108, 110 (Ct.App. 1984), (a more literal approach to subsection 6 of I.C. § 17-201 was followed).

*1228 A.

The Omitted Spouse
I.C. § 15-2-301 provides:
"15-2-301. Omitted spouse.  (a) If a testator fails to provide by will for his surviving spouse who married the testator after the execution of the will, the omitted spouse shall receive the same share of the estate he would have received if the decedent left no will unless it appears from the will that the omission was intentional or the testator provided for the spouse by transfer outside the will and the intent that the transfer be in lieu of a testamentary provision is shown by statements of the testator or from the amount of the transfer or other evidence.
"(b) In satisfying a share provided by this section, the devises made by the will abate as provided in section 15-3-902 of this code."
Hence, a determination that someone is an omitted spouse is a determination "against the validity of the will" (I.C. § 17-201(3)) as to the omitted spouse, but not as to the other devisees. Upon such a determination, those other devisees' share is abated but not reevaluated based on intestacy. The will remains partially valid. I.C. § 17-201(3) should not be read to mean the order must be against or in favor of the validity of the whole will before an appeal can be taken under this section. Since the rights of the spouse are substantially altered upon the determination that he is an omitted spouse, the will is necessarily and substantially invalidated.
This is exactly the situation in the present case. Keeven is arguing against the validity of the will. The magistrate court's order was, therefore, a determination that the will was valid. Hence, the order that Keeven was not an omitted spouse under I.C. § 15-2-301 is appealable under I.C. § 17-201(3). I.C. § 17-201(3) must be read in light of I.C. § 15-2-301 as to an omitted spouse and, arguably, as to pretermitted children under I.C. § 15-2-302 as well. This, however, does not necessarily mean that any other devisee has a similar right to appeal under I.C. § 17-201(3) upon a ruling that the share they take under the will is invalid, at least not until the distribution of the estate.
Since Keeven has grounds to appeal the magistrate's determination that he is not an omitted spouse, based on I.R.C.P. 83(a)(3) through I.C. § 17-201(3), it is unnecessary for us to decide whether the magistrate's certification of this part of its order as final was an abuse of discretion.

B.

Characterization of Decedent's Real Property
Since the magistrate court's order that Keeven was not an omitted spouse is appealable under I.C. § 17-201(3) and I.R.C.P. 83(a)(3), then under I.A.R. 17(e) all other interlocutory orders issued prior to the entry of the final appealable order are available for review. Rule 17(e) reads in pertinent part:
"Rule 17. Notice of appeal  Contents.  A notice of appeal shall contain substantially the following information:
"...
"(e) Designation of Appeal. (1) A Designation of the Judgment, Order or Decree Appealed From. The notice of appeal shall designate the final judgment, order or decree appealed from which shall be deemed to include, and present on appeal:
(A) All interlocutory judgments, orders and decrees entered prior to the judgment, order or decree appealed from, and
(B) All final judgments, orders and decrees entered prior to the judgment, order or decree appealed from for which the time for appeal has not expired, and
(C) All interlocutory or final judgments, orders and decrees entered after the judgment, order or decree appealed from."
If there is a final appealable order in a case and an appeal is properly taken from that order, then all other orders *1229 which would otherwise not be appealable may be considered by this Court. Therefore, on remand, the trial court can be correctly advised on the law as it relates to all the issues of the case. Otherwise, much judicial time and resources may be wasted because the parties might have to take another appeal in order to test those same interlocutory orders which this Court could have decided when it decided the final appealable orders in the first appeal.
This same concept of judicial economy is contained in I.C. § 1-205 which provides that when a case is remanded by this Court for a new trial, "the court shall pass upon and determine all the questions of law involved in the case presented upon such appeal, and necessary to the final determination of the case." We have always liberally construed this provision to allow this Court to decide all the issues in a remanded case that will be necessary for the final determination of the case. Olson v. Idaho Dept. of Water Resources, 105 Idaho 98, 99-100, 666 P.2d 188, 189-190 (1983); State v. Stoddard, 105 Idaho 533, 539, 670 P.2d 1318, 1324 (Ct.App. 1983). This is true even though an issue so decided is not specifically and separately assigned by the parties as error. Neilsen & Co. v. Cassia and Twin Falls County Joint Class A School Dist. 151, 103 Idaho 317, 318, 647 P.2d 773, 774 (Ct.App. 1982); Barry v. Arrow Transportation Co., 80 Idaho 447, 454, 333 P.2d 1008, 1012 (1958). Our duty to facilitate the trial court's final adjudication of the case is not diminished merely because we are affirming the trial court and remanding for a continuation of proceedings stayed by the appeal rather than remanding from a reversal for a new trial.
It is evident, therefore, that I.A.R. 17(e) and I.C. § 1-205 are parallel provisions and both serve the ends of judicial economy. Both contemplate that if there is a final appealable order before the Supreme Court, the Court should resolve all interlocutory issues which have been passed upon by the trial court so that possibly another appeal will be avoided. Hence, although an order declaring part of decedent's property as separate or community is not normally an appealable order, I.C. § 17-201 and Estate of Freeburn, 97 Idaho 845, 848, 555 P.2d 385, 388 (1976), we will address this issue raised in Keeven's appeal based on the mandate of I.A.R. 17(e) and I.C. § 1-205.

II

The Omitted Spouse
We now reach the merits of that part of the magistrate's order granting partial summary judgment to the personal representative on the issue of the omitted spouse, an issue of first impression before this Court. We affirm the magistrate's order that Keeven cannot be considered an omitted spouse under the decedent's will since he was specifically provided for in the will.
Keeven had moved in with the decedent and lived with her on a full-time basis since 1976, three years before the will was executed. Eleven months afterwards, they were married. After marriage, the decedent did not revise her will even though she was in very poor health. She died two and one-half years after her marriage. Under these circumstances, the magistrate court correctly held that Keeven was specifically provided for by name, even though referred to as "my dear friend," in the will and was not an omitted spouse.
Keeven argues that if the will is executed before marriage and provides for the soon-to-be spouse by name, the will must specifically indicate his capacity as spouse, or state that he is included in the will in contemplation of marriage. A provision for a "dear friend," Keeven argues, is not equivalent to a provision for a "spouse," therefore, he is omitted within the meaning of I.C. § 15-2-301.
I.C. § 15-2-301 is identical to the corresponding section of the Uniform Probate Code, but has never been construed by this Court. The section is designed to avoid the unintentional disinheritance of the spouse of a testator who executes a will prior to the marriage but neglects to revise it afterwards. *1230 According to the Editorial Board Comment, this section "reflects the view that the intestate share of the spouse is what the decedent would want the spouse to have if he had thought about the relationship of his old will to the new situation." See Uniform Probate Code, § 2-301, 8 U.L.A. 88 comment (1983).
Originally, at common law and later through legislation, many states applied the rule that, whether the testator was a man or a woman, his or her subsequent marriage revoked the will either absolutely, or as to the spouse, or unless it appeared from the will that it was made in contemplation of marriage, or unless the spouse was provided for in the will or otherwise mentioned therein so as to indicate an intention not to revoke. T. Atkinson, Law of Wills § 85 at 424-25 (2nd ed. 1953). Although the Uniform Probate Code does not achieve its result by specifying revocation of the will, its requirement that an omitted spouse not provided for in the will receive the share he or she would have inherited by intestacy clearly reflects a familiar and long standing feature of the law of wills. Estate of Christiansen, 655 P.2d 646, 649 (Utah 1982).
In addressing a case very similar to the present case, the Utah court noted that
"Some statutes in force when the Uniform Probate Code was drafted specified that in order to avoid the rule of revocation by marriage a provision for the surviving spouse must have been included in the will in contemplation of marriage. In other words, the will provision must have been executed in favor of the recipient in his or her capacity as a prospective spouse. Even where there was no such requirement in the statute, some cases have imposed that requirement, though others have not.
... .
"Even though `contemplation of marriage' figured prominently in prior statutes and case law, the Uniform Probate Code makes no mention of that legal requirement. In a statute so carefully drafted, that omission must have been deliberate. We think it would therefore be inappropriate for the `contemplation of marriage' requirement to be re-engrafted by judicial decision. The interpretative problems entailed in applying that requirement to various testamentary dispositions, described in Estate of Ganier, Fla.App., 402 So.2d 418, 421 n. 3 (1981), confirm the wisdom of avoiding that requirement unless it is clearly imposed by statute. Here it is not." Christiansen, supra at 649.
We agree with the reasoning of the Utah court and hold that a testator can "provide by will for his surviving spouse" in such a way as to prevent the recipient from being an "omitted spouse" under I.C. § 15-2-301 even though the devise was not expressly made in contemplation of marriage.
It is possible that the devise in the will is so minimal and made in such a way that it appears the testator "failed to provide by will for his surviving spouse." The burden of establishing this, however, is on the surviving spouse. In order to satisfy this burden, "the evidence must be sufficient to establish that the testamentary gift specified before the marriage could not reasonably represent the testator's effort `to provide by will for his surviving spouse.'" Christensen, supra at 650; Estate of Ganier v. Estate of Ganier, 418 So.2d 256, 260 (Fla. 1982).
The relevant factors to consider are:
"(1) the alternative takers under the will, (2) the dollar value of the testamentary gift to the surviving spouse, (3) the fraction of the estate represented by the gift, (4) whether comparable gifts were made to other persons, (5) the length of time between execution of the testamentary instrument and the marriage, (6) the duration of the marriage, (7) any inter vivos gifts the testator has made to the surviving spouse, and (8) the separate property and needs of the surviving spouse. For example, if a testator's will made token gifts to various friends, one of whom married the testator years later, the original gift is not likely to qualify *1231 as a `provision by will for his surviving spouse.'" Christensen, supra at 650.
It is undisputed that the decedent and Keeven were more than just friends. They had an intimate personal relationship and were living together well before the will was executed. Decedent provided that Keeven have a portion of her real property equal to that of one of her children. Since the vast majority of her estate consisted of her home, this is more than a token inheritance. In fact, when the statutory allowances are included, Keeven's share of the estate far exceeds the share of any of the children. Keeven is amply provided for by the will and by the statutory allowances and with those factors mentioned above in mind he cannot be considered an omitted spouse. The magistrate's order that Keeven is not an omitted spouse within the the meaning of I.C. § 15-2-301 is, therefore, affirmed.

III

Characterization of Decedent's Real Property
In the inventory of the estate, the personal representative characterized the decedent's house in Lava Hot Springs, her only real property, as her separate property. The magistrate court subsequently granted the personal representative's motion for partial summary judgment confirming this characterization of decedent's real property. We affirm the magistrate's order.
In support of her motion for partial summary judgment, the personal representative filed an affidavit and a copy of the Warranty Deed to the real property. These established that Barbara Van Leuven purchased the land in 1971 by the Warranty Deed, which has been recorded and is in her name only. In 1976, she began construction of a house which was completed by the time of her marriage to Keeven. Therefore, in February of 1980, when the decedent and Keeven were married, the land and house attached to it were the decedent's separate property, pursuant to I.C. § 32-903. That provision expresses the most universally accepted principle of community property property law in Idaho:
"32-903. Separate property of husband and wife.  All property of either the husband or the wife owned by him or her before marriage, and that acquired afterward by either by gift, bequest, devise or descent, or that which either he or she shall acquire with the proceeds of his or her separate property, by way of moneys or other property, shall remain his or her sole and separate property."
Thus, the burden was placed on Keeven to present evidence of any interest he claimed in his wife's separate property. Keeven did file an affidavit in opposition to the personal representative's motion, and stated that he was the one who originally advised the decedent to purchase the land. When construction of the house began in 1976, Keeven stated that "It was decedent's intent and our agreement that at all times the house would be considered as belonging to each of us." Keeven also claimed he performed much of the construction work on the house and garage, expended his own money on the home and did all the landscaping.
The personal representative objected to the magistrate court's consideration of Keeven's affidavit. She asserted that I.C. § 9-202(3), Idaho's Deadman Statute, rendered the affidavit inadmissible and, therefore, under I.R.C.P. 56(e) it could not be considered in the motion for partial summary judgment. The pertinent part of I.C. § 9-202(3) states,
"9-202. Who may not testify.  The following persons cannot be witnesses:
"...
"(3) Parties or assignors of parties to an action or proceeding, or persons in whose behalf an action or proceeding is prosecuted against an executor or administrator, upon a claim or demand against the estate of a deceased person, as to any communication or agreement, not in writing, occurring before the death of such deceased person."
*1232 In Argyle v. Slemaker, 99 Idaho 544, 585 P.2d 954 (1978), we stated that "the statute bars (1) certain persons from testifying (2) in specified actions (3) as to certain communications. All three portions of I.C. § 9-202(3) must be satisfied in order for the evidence to be barred." Id. at 547, 585 P.2d at 957. In this case, all three requirements are clearly met in that: (1) Keeven is a party in this action against the executrix or administratrix; (2) his claim is against his deceased wife's estate; and (3) his proffered testimony is as to a communication or agreement, not in writing, occurring before the death of his wife.
In Argyle, we found that the third requirement had not been met. However, the facts in the present case, as Keeven asserts them in his affidavit, can easily be distinguished. In Argyle, the appellants had been barred from testifying that a deed to property they had owned was delivered to the respondents without any description of the property conveyed. The deed itself clearly existed and this Court merely refused to read I.C. § 9-202(3) so broadly as to exclude appellant's testimony as to the state of that deed's description upon delivery. Such testimony was not a "communication or agreement" within the meaning of the Deadman Statute. We said, "I.C. § 9-202(3) does not bar testimony concerning a state of affairs or matters of fact occurring before decedent's death." Id. at 547, 585 P.2d at 957.
What Keeven is relying upon here is an oral agreement, pure and simple. Keeven is not claiming the 1971 Warranty Deed of the property is in any way invalid. Rather, he admits in his affidavit that "The decedent and the undersigned [Keeven] had intended to get the title straightened out; however, we had not got around to it prior to the time of decedent's heart attack which claimed her life." Unfortunately, what Keeven claims he and his wife intended to do in the future cannot rise to the level of written evidence to substantiate the alleged agreement to convey a real interest to Keeven. He produced no written evidence whatsoever to establish his claim, whether it be in the form of deeds, invoices, contracts, or even letters by the decedent. The magistrate court, therefore, correctly applied I.C. § 9-202(3) when it ruled Keeven's affidavit inadmissible for purposes of determining the personal representative's motion for partial summary judgment.
Even without Keeven's affidavit, there still remained before the magistrate court the issue of whether there existed a genuine issue of material fact so as to preclude granting the motion for partial summary judgment. I.R.C.P. 56(c). The personal representative, as the moving party, has the burden of showing the absence of any genuine issue of material fact and any evidence she presents must be viewed in a light most favorable to the nonmoving party. LePelley v. Grefenson, 101 Idaho 422, 428, 614 P.2d 962, 968 (1980); Shaw v. City of Rupert, 106 Idaho 526, 528, 681 P.2d 1001, 1003 (1984).
The only written evidence before the magistrate relating to Keeven's claim of an interest in decedent's real property was the will itself. As noted above, the will left a one-sixth interest in the real property to Keeven. It made no reference whatsoever to any agreement that Keeven should have a greater interest in the real property because of his help to the decedent in acquiring it and building the house on it.
Under Idaho's community property system, any agreement settling the real property rights of husband and wife entered into prior to or during marriage must be in writing, executed and acknowledged in the same manner as conveyances of land. I.C. § 32-917. Such agreements must also be recorded. I.C. § 32-918. If no recording occurs, the agreement may still be binding between the parties, absent any intervening rights. I.C. § 32-919; Stockdale v. Stockdale, 102 Idaho 870, 873, 643 P.2d 82, 85 (Ct.App. 1982).
Thus, although a husband and wife may agree to alter their real property rights at any time, even before marriage, they must engage in certain formalities for those altered *1233 property rights to be recognized against third parties. Stockdale, supra. If there really was an agreement between Keeven and the decedent as Keeven alleges, the trial court had no evidence before it which suggested those formalities had been met. The evidence the court did have, namely the will itself and the unchanged Warranty Deed, suggested quite the opposite. Idaho law does not recognize the transmutation of real property by oral agreement. Id.; Griffin v. Griffin, 102 Idaho 858, 862, 642 P.2d 949, 953 (Ct.App. 1982). Therefore, even if Keeven's affidavit had been admissible, it would not have created a genuine issue of material fact. Hence, we affirm the magistrate court's grant of partial summary judgment that the decedent's real property is her separate property.
Having affirmed the magistrate's orders on the issues of the omitted spouse and the character of the decedent's real property, we remand this case back to the magistrate court for a completion of the probate proceedings.
Costs to respondent.
No attorney fees on appeal.
SHEPARD, BAKES and HUNTLEY, JJ., concur.
BISTLINE, Justice, dissenting.
My only concern is with Part II of the opinion for the Court. On beginning my reading of Part II the handwriting on the wall materialized in the second paragraph thereof when I encountered the ipse dixit that "the decedent chose not to revise her will even though she was in very poor health." The italicizing of "chose" is of my own choice  by which I mean to suggest that it is an act deliberately done and with full knowledge of what I am doing. How a majority can for the Court divine that Barbara Louise Keeven exercised a choice, knowledgeable or otherwise, is far beyond my ken. If Barbara Louise Keeven had any knowledge of the contents of I.C. § 15-2-301, no one has directed my attention to any place in the record which establishes that fact. If she learned of that section of 1971 statutory law in casual conversation or gossip with older friends, she heard more discussion than that with which I have been blessed, and it is not improbable that more shop talk of the legal profession has passed by these ears than those of Barbara Louise Keeven, who, so far as we know, was the ordinary housewife.
The Uniform Probate Code was not designed for housewives to ponder at tea-parties or quilting bees. It was designed for lawyers and judges who will know what a testator is, what a testamentary provision is, what an omitted spouse is, what a transfer is, and what is meant by "in lieu of." It is a statutory provision which judges will apply, like geometricians to a given hypothesis, to a given state of existing facts.
For every married couple each is the spouse to the other. Until two people have married, they are not husband and wife; neither is spouse to the other. Spouse is a word of art which the legislature apparently selected to use for brevity, because it necessitates knowing or comprehending a short, very short, definition. According to Black's Law Dictionary, Fifth Edition, p. 1258: "Spouse. One's wife or husband."
After her first widowhood, until Barbara Louise Keeven married Sylvester Keeven, she had no spouse. As older people are often by other older people encouraged to do, it is a fact that she executed a will. In that will she provided for Sylvester Keeven, whom she referred to as her dear friend. Taking the legislature's law as written, Sylvester Keeven on their nuptial day became her spouse and Barbara Louise Keeven became his spouse. Her will, however, made no provision for any spouse. The word spouse went wholly unmentioned.
It would be asinine to believe other than that the legislative intent was, in 1971, to perpetuate that which had theretofore and forever been the statutory law in Idaho, an embodiment of the public of Idaho that in all cases  whether of testacy or intestacy  the surviving spouse will be afforded that protection in the future which social *1234 justice, as reflected in those statutory laws, requires.
In the case of intestacy, since the creation of the Territory of Idaho in 1864, the law of Idaho provided that the surviving spouse was entitled to have the court set apart out of the deceased spouse's estate a homestead. Probate Practice Code of 1864, § 123; former I.C. § 15-502, in effect until adopting of the Uniform Probate Code in 1971. Also dating back to 1864, former I.C. § 14-103 (superseded Vol. 3 of the Idaho Code, published 1947) provided that on a spouse dying, leaving more than one child living, the surviving spouse would inherit one-third of the estate. Other former sections of the statute provided, as we learned in law school, that marriage subsequent to execution of a will revokes that will of a testator unless the spouse created by the marriage predeceases the testator, as to a man, and in any event as to the will of an unmarried woman. Former I.C. §§ 14-311, 14-312, 14-313.
If the Uniform Probate Code of 1971 intended any drastic changes in that long-established body of law, all that is discernible is a change to let the will survive, assuming its validity in requisite respects, but to treat omitted spouses as pretermitted children were forever treated where the will was otherwise valid. My reading of the majority opinion is that in this regard we are not of unlike views.[1] We quickly part company, however, where the majority, complacently agreeing with the Utah court, goes on to hold that because the testamentary provision for Sylvester Keeven as a "dear friend" is "more than a token inheritance," and because his share of the estate far exceeds the share of any of the children, he "cannot be considered an omitted spouse."
With all due respect to my brethren, and for lack of a ready better descriptive word, this is ridiculous. Clearly ignoring the plain language of the statute, the Court relegates Sylvester Keeven to that share of the estate which Barbara Louise Hurst left him when he was unto her, her "dear friend." When Barbara Louise Keeven passed on, her will made no provision for her spouse  who also happened to be the same Sylvester Keeven.
The majority, of course, does not engage in any reasoning process to reach its result, but simply seizes on Estate of Christensen, 655 P.2d 646 (Utah 1982). The Christensen court in the opening lines of its decision very visibly placed on the wall the handwriting which forecast its decision.
Appellant [widow], who married the 83-year-old testator six weeks before his death, contends that she is entitled to 50 percent of his $10 million estate as an "omitted spouse" under U.C.A., 1953, § 75-2-301." Christensen, supra, 655 P.2d at 647.
That court had to do some rather fancy high-stepping to attain its goal. First, it had to acknowledge the prior history of the common law and its own statutory law, much as I have done. It had to acknowledge that the earlier pertinent statutes "specified that in order to avoid the rule of revocation by marriage a provision for the surviving spouse must have been included in the will in contemplation of marriage. In other words, the will provision must have been executed in favor of the recipient in his or her capacity as a prospective spouse." Id. at 649. Conceding openly that "`contemplation of marriage' figured prominently in prior statutes and case law," the Utah court wholly abandoned such long-established principles, simply because language to that effect had not been "clearly imposed by statute." Id. at 649.
Having so positioned itself, the Utah court seized upon the holding of a case from the Florida court of appeals, Estate of Ganier, 402 So.2d 418 (Fla.App. 1981), saying its "reasoning was persuasive of the same result in this case." Id. at 649. The Utah court kept to itself, however, what that illuminating reason was. In an ipse *1235 dixit nonreasoning of its own, the Utah court was content to merely hold, and hold it did. The court held that a testator "can provide by will for his surviving spouse [the language of the pertinent statute] in such a way as to prevent the recipient from being an `omitted spouse'... ."
The Utah court, however, is deserving of credit in conceding as it did, Christensen, supra, 655 P.2d at 650, that the testator in that case "may simply have neglected to amend his will after marriage, or he may have re-examined the will and decided that his previous testamentary gift would adequately provide for his new spouse."[2] Additional credit is due for recognizing, implicitly as it does, the social policy that widows who survive should be adequately provided for. No credit, however, should be extended to the Utah court for giving no mention to the proposition that that testator did not know the law or the extent and ramifications of the law, which has to be a distinct third possibility, as I have discussed, supra. And, no credit is due the Utah court for not considering that if the multi-millionaire testator in that case was aware of the law, or his attorney was, a post-marriage three-line codicil would have removed all doubt.
The Utah court is also deserving of acknowledgment of its devious ingenuity where it goes on to add in the next sentence following the one above set forth, that where there is no way of knowing, "the surviving spouse should be permitted to show that in the circumstances presented, including the provision of a particular testamentary gift, the testator failed to provide by will for his surviving spouse... ." Having been so kind, the Utah court next proceeded to open Pandora's box by enumerating eight relevant considerations which must go into that factual equation, and in that manner cast, and acknowledged that it did so, an insurmountable burden on the deceased Mr. Christensen's widow. End of case. Result: One-half of 83-year-old Mr. Christensen's millions did not fall into the undeserving hands of his omitted short-term, and presumably young, wife, but instead remained in the custody of the respondent bank (by name unmentioned in the opinion) which would administer it all as trustee for Mr. Christensen's granddaughter. Needless to say, were I a legal scholar or commentator, I would place no precedential value on the Utah court's opinion.
Nor am I that impressed with the Ganier decision from a Florida court of appeals. Unmentioned in either the opinion of the Utah court or the opinion of today's majority is the fact that it is a bare two-one decision adverse to a 76-year-old widower and a 79-year-old widow who met in 1973 and shortly after commenced living together. No millions of dollars were involved here, and both of limited income, they pooled their resources. Five years later (at ages 81 and 84) Emma broke her hip and thereafter was mobile only by use of a walker. 402 So.2d at 420. Did Fred abandon her? Is that why he for equitable consideration was destined not to prevail? Likely, one might say, but not so. Picking up the majority opinion from Ganier: "She required care by a nurse and Frederic. Frederic decided to marry Emma in July of 1978." Presumably, although the opinion does not speak to it, Emma also decided to marry Fred, unless it be that under Florida law such matters are unilaterally determined by the male alone. At any rate, they were married; Emma later became even more invalided by a stroke. Fred was her guardian and Emma died in the sixth month of their marriage. Unfortunately, and what apparently would have been disturbing to the two members of the Court of Appeals who reversed the lower court, Fred, as guardian, husband, and nurse, had not properly distinguished her separate funds from his separate funds. In not accounting, Fred testified that he thought the funds belonged to him. Emma's 1977 will left to Fred her bank account at Security *1236 First Federal, and also her bank account at Atlantic Bank. The two of them had a joint account with the latter. Dwelling no longer there, as the reader can go to the opinion, the trial court considered immaterial to the "omitted spouse" issue whether or not Fred misappropriated or misspent Emma's funds. 402 So.2d at 420. Having so stated, the Court of Appeals was implicitly of a different view:
We reverse this judgment because the record clearly shows that Frederic was "provided for" in Emma's will, at least prima facie, within the meaning of section 732.301, Florida Statutes (1979). Id. at 420.
How it rationally was able to reverse I am unable to perceive from a reading of the opinion  unless it is this:
The record clearly shows that Emma married after making her will; that Frederic survived her; and that there was a specific bequest of bank accounts to Frederic in Emma's will. As stated in the Livingston case, the burden was on Frederic to prove that the will did not provide for him. He failed to carry this burden. Id. at 422.
It was that holding, so I surmise, which the Utah court admired and utilized in its opinion. It is, however, devoid of any ratio decidendi, if that Latin word means a sound legal analysis predicated on logic and reasoning, and with a proper regard for clear statutory language couched in the Mother Tongue, as the late Senator Sam Irvine so well stated it.
Another not insignificant feature of the Florida decision is that Florida has a statute, § 732.201 Fla. Stat. (1979) which provides that if a surviving spouse is dissatisfied with the provision in the will made for him or for her, the widow or widower has the right to take an elective share of the estate  which the statute sets at 30 percent. I will not concern myself with attempting the mathematics of comparing 30 percent to what Fred did receive out of Emma's estate, nor with what Sylvester receives out of his wife's estate, and although I can see that 30 percent of $10 million is more than Mrs. Christensen received, the point is that this fact was as equally influencing on the Ganier majority as was octogenarian Fred's inability to comprehend his obligations as a guardian.[3] The Utah court ignored that aspect of the Florida decision, and domino-like, so has the majority in the case before us.
As I intimate, were the majority to eschew deciding the case before us solely on the basis of the Utah decision  in turn based solely upon the Florida decision  in favor of taking the statute as it is and also our own case law and former statutory law as it was, and formulate a decision based on logic and reasoning, I might very well be persuaded to join it. But, unfortunately, there is as little of ratio decidendi in the majority's opinion in our case as there was in the Florida court's opinion  as well pointed out in the reasoned opinion of dissenting Judge Upchurch. It should be his opinion which the Idaho Supreme Court should this day find persuasive. He wrote:
Under the common law, the marriage of a man and the birth of a living child subsequent to the making of his will operated as a complete revocation unless provision was made in the will in contemplation of both events. Herzog v. Trust Co. of Eastern, 67 Fla. 54, 64 So. 426 (1914); Belton v. Summer, 31 Fla. 139, 12 So. 371 (1893). The marriage of a woman revoked her will even without the birth of issue. Colcord v. Conroy, 40 Fla. 97, 23 So. 561 (1898); 95 C.J.S. Wills § 291 (1957); Redfearn, Wills and Administration in Florida, § 8.10 (5th ed. 1977). These rules were not changed in Florida until the Probate Act of 1933. The language of the act as found in section 8(d), section 5477(4)(d), Comp. Gen.Law Supp. was essentially the same as now found in section 732.301, Florida *1237 Statutes (1977) with which we are now concerned.
The adoption of the Probate Act of 1933 was not a rejection of the common law rules but rather a codification of them. The common law had, by then, changed from the earlier rule which provided that marriage and the birth of a child or marriage alone in the case of a woman, after execution of a will resulted in revocation of the entire will. Easterlin v. Easterlin, 62 Fla. 468, 56 So. 688 (1911). The contemplation of marriage exception developed to avoid the unfairness to other beneficiaries where it was obvious the testator had executed his will with marriage to this particular spouse in mind. Belton v. Summer, 31 Fla. 139, 12 So. 371 (1893).
The purpose of the statute is to give effect to a will which reflects a testamentary intent that the will be effective even should the testator subsequently marry and to protect the surviving spouse's right to inherit where such intent is not demonstrated.
Most courts have rejected any inquiry into adequacy of a provision in a will. In interpreting a will, a court is not concerned with the amount of the testator's bounty. In Re Bridler's Estate, 165 Cal. App.2d 486, 331 P.2d 1028 (1958); In Re Brannon's Estate, 111 Cal. App. 38, 295 P. 83 (1931); Czepiel v. Czepiel, 146 Conn. 439, 151 A.2d 878 (1959).
The majority opinion overlooks a well known fact of life; that is, that good friends often marry. The circumstance that a person was sufficiently appreciated to be the recipient of bequest in a will should not militate against this or her taking by intestacy when a person who was a stranger to the testator and therefore not included in the will can so elect. The inquiry of the court should be to determine whether the testator intended that the will should remain his will after his marriage. Therefore, the ultimate question is, did he contemplate marriage at the time he executed his will?
While it is true as the majority suggests, that section 732.201, Florida Statutes (1979) prevents a surviving spouse to whom a small bequest is given in the will from being "disinherited" because he or she may choose to take an elective share, this is small consolation to the spouse who would otherwise take the entire estate as would be the case where the decedent had no lineal descendants. § 732.102(1)(a), Fla. Stat. (1979).
Some courts, interpreting similar statutes, reason that if property is specifically devised or bequeathed to a person and that person and the testator subsequently marry, then the requirements of the statute are met because the will speaks as of time of death. In Re Appenfelder's Estate, 99 Cal. App. 330, 278 P. 473 (1929). Most courts, however, have rejected this reasoning as did the California Supreme Court in In Re Poisl's Estate, 44 Cal.2d 147, 280 P.2d 789 (1955). There the court pointed out that decisions applying the contrary rule gave no consideration to the underlying purpose and policy of the statute is remarkably similar to section 732.301, Florida Statutes (1977).[[4]]

*1238 In the case before us, the trial court applied the correct burden of proof as enunciated in Livingston. In its order, the court said in paragraph four: "Said reference to petitioner was not made to him in the prospective status as the husband of the testatrix... ." There is substantial evidence to support this finding. There was no evidence to support this finding. There was no evidence to support the view that marriage was contemplated, and the court so found.
If Mr. Ganier were the pretermitted spouse and there is indeed a requirement that marriage be contemplated, it is not necessary to reach the question of whether the bequest under the will lapsed. If it is demonstrated that he misused funds in his trust as guardian, recovery can be had. I readily agree with the majority that he could not misappropriate his wife's property and then contend his bequest had lapsed because of that misappropriation.

The record reflects that Mr. Ganier was devious and greedy in dealing with his wife's funds. That fact should not persuade us to adopt an impractical rule of law which, in my opinion, is in direct conflict with established and respected precedent. Ganier, supra, 402 So.2d at 423-24 (emphasis added).
Today's ipse dixit opinion for the Court is on a par with the Ganier majority opinion, and both are a far cry from the law and logic laid out by Judge Upchurch.
NOTES
[1] The majority says the "requirement that an omitted spouse not provided for in the will receive the share he or she would have inherited by intestacy reflects a familiar and long standing feature of the law of wills."
[2] The reader will remember that today's majority who rules against Sylvester Keevan was less fair, and simply divined that Barbara Louise Keevan chose not to revise her will after marrying Sylvester.
[3] In that regard the Idaho courts are less demanding. Cf. Grover v. Grover, 109 Idaho 687, 710 P.2d 597 (1985).
[4] California Probate Code § 70, to which Justice Upchurch refers, provides:

If a person marries after making a will, and the spouse survives the maker, the will is revoked as to the spouse, unless provision has been made for the spouse by marriage contract, or unless the spouse is provided for in the will, or in such way mentioned therein as to show an intention not to make such provision; and no other evidence to rebut the presumption of revocation can be received.
Former I.C. § 14-312 was almost identical to California's section up until Idaho's Probate Code was revised in 1971, and at one time the two were identical. Prior to the adoption of the new Probate Code, it read:
Revocation by marriage.  If, after making a will, the testator marries, and the wife survives the testator, the will is revoked, unless provision has been made for her by marriage contract, or unless she is provided for in the will, or in such way mentioned therein as to show an intention not to make such provision; and no other evidence to rebut the presumption of revocation must be received.